No. 5453.

## MIGUEL AVENDANO vs. I. W. ARTHUR & CO.

Where the evidence shows that the parties intended, originally, that the contract of lease should be reduced to writing, neither will be bound until it is signed by both.

APPEAL from the Fifth District Court, parish of Orleans. *Cullom,* J.

*George L. Bright* for plaintiff and appellee.

*Singleton & Browne* for defendants and appellants.

The opinion of the court was delivered by

MARR, J. This suit was brought on the sixteenth May, 1873, with the usual provisional seizure, to recover the balance of rent alleged to be due, and to become due, on a three-years' lease, beginning first October, 1871, ending thirtieth September, 1874, at $266.66 2-3 per month, payable on the first of each and every month.

The defendants denied that they had made a lease for three years as alleged. They also answered that:

" These defendants specially deny that they ever took a lease of the premises for the time alleged in the petition. Such a lease was spoken of between the parties in interest, and these defendants would have made such a lease had the conditions agreed on been complied with. These defendants stated that they would make a lease for the time specified in the petition provided the premises were put in good, genteel, and tenantable condition. That the plaintiff neglected and refused to put the premises in such condition, and these defendants refused to sign the lease and monthly notes for the rent thereof presented by the plaintiff to the defendants to be signed by these defendants for the purpose of consummating and completing said contemplated lease. That these defendants specially deny that said contemplated lease (as alleged in the petition) was ever in fact entered into, but these defendants have continued

Avendano vs. Arthur & Co.

to occupy said leased premises by operation of law; viz., by the month only."

The judgment of the district court was in favor of plaintiff, with landlord's lien and privilege on the property provisionally seized for arrearages, and for rent to become due for eighteen months; that is, for one month, due first of October, 1872: for seven months, due on the first day of each month from June to December, 1873, inclusive; and for ten months, due on the first day of each month from January to October, 1874, inclusive, subject to a credit for rent for one month paid after the institution of the suit. From this judgment defendants appealed.

The term commenced on the first of October, 1871; but the premises were vacant, and defendants, with the permission of plaintiff, went into possession in September. Defendants did not sign either a lease, or notes for the monthly rent. Up to May, 1873, when the rent would have amounted to $5066 66⅔, payments had been made amounting to $4800, leaving $266 66⅔, or the rent for one month, unpaid at the time suit was brought. A receipt was introduced showing that a payment on the sixteenth November, 1872, was imputed to the rent due first of October, 1872; so that the defendants at the time the suit was brought owed for the month of April, due first of May, 1873.

On the thirty-first of August, 1872, defendants wrote to plaintiff that they did not want the property at the rate they had been paying; and that an entire new ground floor and a new covering to the shed were necessary to their continued occupancy on any terms. Plaintiff answered that defendants had rented for three years from first of October, 1871; and that they would be required to comply with their contract; that he would make any repairs the law required him to make; and that he was then having a new slate roof put on, "although you never made any request to repair it, and we have never refused to make any necessary repairs."

Arthur says the slate roof had been put on "previous to my writing this letter. I had called Mr. Avendano's attention to the shed roof repeatedly, but I never wrote to him and made a special statement until that time."

The day after the suit was brought, which interfered with the compromise which Arthur & Co. were making with their creditors, defendants, through their attorneys, offered to pay the rent due, and to secure that to become due, up to first of October, 1873: and they added that defendants would not recognize the lease beyond that date, and would go into bankruptcy first. We find in the record no answer to this.

On the tenth of July, 1873, defendants gave plaintiff formal notice in writing that they would vacate the store on the last day of that month; and that they would be ready to deliver possession on the first

day of August. Plaintiff answered that when defendants tendered the leased property he would rent it for their account, and credit them with the proceeds, if any; and that he would go on with the suit.

On the thirty-first July defendants wrote to plaintiff, surrendering the property and tendering the keys; and plaintiff answered that he would, if possible, rent the store, and credit defendants with the proceeds, without prejudice to the pending suit.

The theory of plaintiff is, that defendants owe the rent for seventeen months, up to first October, 1874. On the theory of defendants they would owe for three months only, due first of June, first of July, first of August, 1873, respectively.

Theodore Avendano, who was the agent of Miguel Avendano in all this business, was a witness in behalf of plaintiff. Being asked: "State to the court all you know relative to making the lease to I. W. Arthur & Co," he answered:

"It was in the month of July, 1871. Mr. Arthur wanted to rent the store corner of Common and Front streets. I went to his office and asked him a price for the same. He offered me $3200 per annum for three years. I agreed to that, and then wrote the lease and notes, and sent them to his office to be signed. He promised to sign them. I notified him afterward the lease had not been signed, nor the notes. I sent for them several times by my clerk. He always answered he had no time, but would sign the lease. After he occupied the store, and after many repeated calls for the lease and notes, he came to my office and said he did not want to sign the notes for the whole term of the lease, only wanted to sign them by the year. I told him he could do so for one year, and then the other notes at the end of every year. That is the principal thing about the lease."

Being asked if he had made any written memorandum of the fact, he answered that he had written, the next day, to his brother, Miguel Avendano, who was in Europe. A press copy of this letter, dated July 17, 1871, was produced. It states the renting of this and another store, and the rates, and that the terms would begin the first of October. After speaking of the good credit of the parties, the writer adds: "The leases will be signed hereafter."

On cross-examination this witness says Mr. Arthur went into the store about one month or two before the beginning of the lease.

Question : "The lease was to be reduced to writing?" "Yes."

Arthur states why he refused to sign the lease and notes. "The lease and notes were brought into the office, I think, in the month of October, early. I was not present when they were brought in. When the young man called I told him I should have to see Mr. Avendano; I had complaints to make. I soon discovered the leakiness of the roofs.

I had not at first, and I found after I moved in that Mr. Avendano would do nothing toward fixing the house that was not most specially required. He agreed to put the house in first-rate condition for a store. I felt that he had not done his duty as a landlord. On the fourth day of November I had then resolved that I was not properly dealt with, and I never would sign the lease, and I took them to Mr. Avendano, and so told him that he did not do his duty as a landlord, and I should not and would not sign them, and I laid them down before him on his own desk at his own office; when I laid them on his own desk at his office this (one of the unsigned rent notes) was among the other notes with the lease.    *    *    *    *    *  .  *    *    I told Mr. Avendano I was in the house and had spent nearly a thousand dollars in fitting it up, and saw no means of vacating it then, and would probably have to remain for the season, the first year. He would agree to no specific time, and I would sign no lease, and gave no notes; and I left the lease and notes on his desk in his office, and have not seen them since."

And again, he says: "I don't remember ever telling him about agreeing to sign notes at all other than I was to give a written lease of three years: and after I went in and found the manner in which he had acted, I resolved not to sign the lease at all, or give any notes. I told him I should probably have to stay for one year, as I spent about a thousand dollars in fitting it up, but that I would agree to no specific time or give no notes."

Xiques, clerk of Avendano, who seems to have collected all the rent paid before the suit was brought, except that for the first month, says he wrote the lease and thirty-six notes for the monthly rent, and he took them to Mr. Arthur to be signed. "The first time I saw his book-keeper, or clerk, and left the lease and notes there, and I came back after, and the clerk told me that Mr. Arthur wanted to see Mr. Avendano, and would only sign notes for one year at a time. I came down and saw Mr. Arthur, who told me the same thing."

He says he went again to collect and get the lease and rent notes, " and he answered me that he had seen Mr. Avendano. That's the last time I asked him about the lease or the notes."

Again he says that he asked Mr. Arthur for the lease and the notes, " and sometimes he told me he would sign it, before he told me he had seen Mr. Avendano. The last time I asked him he told me he had seen Mr. Avendano, and I never asked him any more."

Avendano never went to collect the rent. The first payment was on the fourth November, 1871, by check of that date. The receipt for this is in the handwriting of Avendano; and he says he wrote it at his office, and handed it to Mr. Arthur. It is written on the back of that one of the thirty-six notes which would have represented the rent for the

month of October, and would have been payable first of November if it had been signed. The notes, therefore, must have been in the possession of Avendano at his office, at that date, when the rent for the first month was exigible and was paid.

The testimony of Arthur conflicts with that of Avendano as to the leaving of the lease and notes with Avendano. This may well be, and it should be attributed to the degree of importance which they respectively attached to what actually occurred: to the difference in the impression made upon the mind of the one and of the other at the time, and to natural disparity in the power of recollection. The testimony of Arthur and of Xiques satisfies us that on the fourth of November, 1871, Arthur had finally determined that he would not sign the lease or the notes: that he so informed Avendano: that he left the lease and the notes at the office of Avendano at that time: and that he was not afterward asked to sign either lease or notes, except, perhaps, once by Xiques when Arthur told him he had seen Mr. Avendano.

The proof shows that the store and shed were not in good condition. The shed leaked so that whenever it rained goods that had been sold and put out marked for shipment had to be put back into the store. The roof of the store leaked so that it was necessary to put buckets to catch the water; and one leak was over the office. The ground floor was patched in several places, and in rolling out goods it broke in other places. The office had been taken down, and Arthur had part of it put up himself. Avendano had the roof of the store patched, but it leaked the first hard rain afterward. The testimony of Avendano shows that the store and shed were covered with a composition roofing, and that they leaked. He was asked: "Was it not a leaky, worthless shed?" and he answered: "I can only say of that kind, they are always leaky."

Arthur says: "In the summer of 1871 Mr. Avendano and myself had several conversations in relation to the store, and I think it was the last of July or August that we talked over the terms, when the understanding was that I was to take the store for three years, which I was to give a WRITTEN LEASE at the rate of $3200 per annum."

On cross-examination being asked, "You did rent it (the store) for three years?" he answered, "That was our agreement. It was to be rented and a regular lease signed."

Whatever discrepancies there may be in the testimony in other respects, there is none as to this: that both parties understood, at the time they were negotiating, and intended originally, that a lease in writing should be executed. Arthur and Avendano concur in this; and it is manifest from Avendano's contemporaneous letter to his brother Miguel, and his repeated efforts, up to the fourth of November, 1871, to have the lease and notes signed by Arthur. The business was of such

importance to both, that one would naturally suppose that two business men, merchants, would not have been willing to leave it to the uncertainties of a mere verbal agreement; and that they would both understand, without any express stipulation to that effect, that a lease for three years, at a rental aggregating $9600, should be reduced to writing.

Arthur says when he went into the store in September, before the commencement of the term, Avendano was having repairs made. Of course he could not know then what repairs would actually be made. It may be that Avendano had all the repairs made that he considered necessary, and yet Arthur may have expected that more would be done. He expended a considerable sum in fitting up an office, and put a large stock of groceries in the store, so that he could not have moved out without serious inconvenience and loss. The condition of the ground floor, and of the roof of the main building and of the shed, was not such as the business for which Arthur rented the premises required, and it is not strange that he withheld his final consent to the contract so long as they remained in that condition.

However this may have been, the fact remains that the lease and the notes were not signed; and this fact brings the case within the rule, coeval with our jurisprudence, and recognized by us in Fredericks vs. Fasnacht, decided on the seventeenth of December, 1877, that, "Where it has been agreed that the contract shall be reduced to writing, until it is actually written and signed by all parties either may retract." Villeré vs. Brognier, 3 Mart. 349; Des Boulets vs. Gravier, 1 N. S. 422; Wells vs. Dill, 1 N. S. 592; Blocker vs. Tillman, 4 La. 80.

The true distinction is plainly laid down in Carlin vs. Harding, 10 La. 225. Where there is a complete verbal contract, and the parties afterward agree that it shall be reduced to writing, the verbal contract is valid and obligatory, although the subsequent, independent agreement, to have it reduced to writing should not be carried into effect.

In Des Boulets vs. Gravier the principal question was, as stated by Judge Porter, " whether the vendee of a movable, where the contract is to be reduced to writing, can retract before the act is signed, and that although he should be in possession of the thing purchased." The court said: '

"The authorities are express that if the parties agree that the contract is to be reduced to writing, it is not complete until the writing is made and signed. * * * The fact of possession is one of the circumstances which, coupled with others, would have made the sale complete, if there had been no agreement to put it in writing. When that agreement exists, the necessity of complying with it arises from the parties having added that condition to the other things required to make a legal contract."

In Blocker vs. Tillman Judge Martin stated the case thus: "The defendant, having taken a warehouse, proposed to the plaintiff to take charge of it for which it was agreed he should have one third of the net profits. The offer being accepted, the contract was reduced to writing by a third person, subscribed by the plaintiff, and delivered to the defendant, who agreed thereto and promised to sign and deliver it to a third person to keep. Depending on this the plaintiff entered into his duties, and faithfully attended to the affairs of the concern till he was dismissed by the defendant, who placed the warehouse in charge of another."

Delivering the opinion of the court, Judge Martin said:

"The parties contemplated a written contract, to be deposited with a third person, for their common security. Nothing shows in either of them an intention to be bound by a parol contract. The plaintiff himself subscribed the agreement, and gave time to the defendant to do the like. Till the writing was perfected by the signature of all the parties, it was but an inchoate one, and either had the right of recanting. The defendant, in doing so, availed himself of a legal right."

Plaintiff and defendant understood, contemplated, and intended, originally, that there should be a contract of lease in writing. Their final consent was in suspense until that writing was signed. As it never was signed there never was a complete contract of lease for three years between them, nor was there any agreement fixing a lease for a specific term. Arthur & Co. were lessees for an uncertain term; and either party had the right to put an end to it at any time, by giving the other notice in writing, fifteen days before the expiration of the current month. R. C. C. 2686. By the notice of the tenth of July Arthur & Co. did effectually put an end to it on the thirty-first of July, 1873. The evidence shows that they had the legal right to do this; and their liability for the rent can not be extended beyond that date. The numerous payments at the rate of $266 66⅔ per month sufficiently fixed that as the monthly rent; and by the dealing of the parties that rate became obligatory on both, so long as the lease continued.

It is therefore ordered, adjudged, and decreed that the judgment of the district court be so amended as to reject the demand of the plaintiff for all the rent anterior to that due and payable on the first day of June, 1873, and for all subsequent to that due and payable on the first August, 1873. That in lieu of the several sums by said judgment awarded to plaintiff, there be substituted and allowed to him the rent for three months only. That is to say, that plaintiff, appellee, have and recover of defendants, appellants, two hundred and sixty-six dollars sixty-six and two thirds cents ($266 66⅔), with interest at the rate of five per cent per annum from the first day of June, 1873, until final payment; the

like sum, with like interest, from the first day of July, 1873; and the
like sum, with like interest, from the first day of August, 1873. That
thus amended the judgment appealed from be affirmed, and that plain-
tiff, appellee, pay the costs of this appeal.

## CONCURRING OPINION.

EGAN, J. I concur in the decree in this case, but prefer to put my
concurrence upon the ground that the property leased was not in a con-
dition, nor put in a condition within a reasonable time, to serve the uses
for which it was leased; that the lessor was in fault in this respect, and
the lessees had, therefore, and under the law, the right to withdraw
from the contract and to refuse to sign the written lease and notes for
the lease price, and did so refuse, and returned the lease and notes to
the plaintiff unsigned within a very short time, so soon as they discov-
ered the defects in the roof and other parts of the building; and at the
same time informed the lessor that they would not take the leased
premises under the terms and for the time of the original contract; but,
being in the building with their stock of goods, and the business season
being upon them, they would be compelled to keep the property for the
remainder of the season; and the plaintiff thereupon acquiesced in
their refusal to sign the lease and notes for three years and received
monthly rent from them without requiring them to sign the lease or
notes, or to agree to a lease for any other or longer time than that for
which they said they would take it, thus in effect and law abrogating
the old and substituting a new contract.

## CONCURRING OPINION.

MANNING, C. J. I also prefer to rest my concurrence on the grounds
stated by Mr. Justice Egan.